UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OCA, INC., ET AL.                          CIVIL ACTION

VERSUS                                     NO: 07-480

STANLEY STARR, D.D.S., ET AL.              SECTION: R(3)

**ORDER AND REASONS**

Before the Court is defendants' Motion for Summary Judgment. For the following reasons, the Court GRANTS the motion.

I.  **Background**

    A.  **Factual Background**

This matter arises out of business relationship between a private orthodontic practice, Stanley Starr, D.D.S., P.C. (Starr), and its provider of business, financial, and office management services, Orthodontic Centers of America, Inc. (OCA). OCA operates through a network of wholly owned subsidiaries named according to the states in which OCA does business (*e.g.*,

Orthodontic Centers of Massachusetts, Inc.). Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services. Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their operating profit or practice revenue. The BSAs are OCA's primary asset and the source of nearly all of its revenue.

**B.    Business Service and Stock Purchase Agreements**

In 2002, Dr. Stanley Starr, an orthodontist with offices in Massachusetts, affiliated with OCA through a Stock Purchase Agreement and a BSA. (R. Docs. 19-4 and 19-5). Under the Stock Purchase Agreement, Starr transferred patient records and certain other professional assets of his professional corporation — S. Starr, D.D.S., P.C. — to a new professional corporation. (R. Doc. 19-4, SPA). The SPA then converted S. Starr, D.D.S., P.C. into a regular business corporation and provided for Orthodontic Centers of Massachusetts to buy all of its shares for the sum of $1,350,599. (SPA at ¶1(a)). As a result of the agreement, OCA acquired the physical office of Starr's practice, the furniture and equipment, and the staff employees. (SPA, Schedule 4(c)). Starr retained his patient records and other professional assets.

Under the BSA, OCA agreed to provide a range of business and administrative services in exchange for what is designated in the BSA as a "service fee." Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles. OCA was responsible for (i) employment, scheduling and training of office staff; (ii) provision and maintenance of offices, telephones, and utilities; (iii) provision and maintenance of furniture, fixtures, and equipment; (iv) bookkeeping and accounting services; (v) billing and collections services; (vi) administration of the practice's bank account and disbursement of funds therefrom; (vii) installation of computer hardware and software, and training staff on the utilization thereof; (viii) ordering and management of supplies and inventory; (ix) assistance in recruiting associate orthodontists; (x) preparation of statistical data and analyses of the practice's operations; (xi) legal services for the practice's routine operations; (xii) various consulting advice; (xiii) marketing and advertising services; (xiv) negotiation of managed care contracts; and (xv) all other business and administrative services reasonably required. (BSA at ¶¶1.1 and 1.10).

The BSA explicitly states that "OCA is not authorized or qualified to engage in any activity that may be deemed or

3

construed to constitute 'the practice of dentistry' under the applicable laws and regulations of the Commonwealth of Massachusetts." (BSA at ¶1.2). Still, OCA held exclusive control over Starr's orthodontic revenues and controlled the disbursement of funds from the practice's bank account. (BSA at ¶¶1.7-1.8). In addition, although the agreement said Starr was to have "exclusive custody of and control over" the office equipment and furnishings, OCA owned Starr's office equipment and furnishings and leased these items to Starr. (BSA at ¶1.4). Further, although Starr had to consent, OCA had Starr's power of attorney to negotiate managed care plans with preferred provider organizations and health maintenance organizations. (BSA at ¶1.10). These plans were a source of patients and governed the amounts that Starr would be reimbursed for dental services by the insurers or employers if he participated in such a plan.

In the BSA, both parties agreed to covenants not to compete. (BSA at ¶¶ 5.1-5.2). Specifically, OCA agreed not to affiliate with more orthodontic practices within the designated market area than the total number of Toys 'R Us or Home Depot stores within the designated market area. (BSA at ¶5.1). Starr agreed that he would not be involved with any other orthodontic practice, solicit patients to patronize any other orthodontic practice, or be involved in any enterprise that provides management services

4

to orthodontic practices during the term of the agreement. (BSA at ¶5.2(b)). Starr also agreed that he would not solicit any patients of the practice to patronize another practice not affiliated with OCA, be involved in a practice operating within the designated market area or within two miles of the practice, or be involved in the provision of business services to an orthodontic practice for a period of two years after the BSA expired or was terminated. (BSA at ¶5.2(c)). The BSA was to last for a term of 25 years. (BSA at ¶4.1). The BSA also contained a choice of law provision which stated that the laws of Massachusetts shall govern the validity and interpretation of the agreement. (BSA at ¶8.5).

    **C.    Service fee arrangement**

Under the BSA, Dr. Starr agreed to pay OCA in accordance with a formula. For the first three years, the fee was to be the following amount:

    (1) patient revenue, less

    (2) the sum of (A) the Initial Minimum Orthodontist

    Amount and (B) any Additional Orthodontist Amounts.

(BSA, Exhibit B). Regardless of that calculation, OCA was guaranteed at least $549,244 for the first three years, except under certain circumstances. (BSA, Exhibit B). After three years, the service fee was to equal the total center expenses

plus 40% of the net operating margin. (BSA, Exhibit B).

   **D.   Procedural Background**

On March 14, 2006, OCA and its subsidiaries filed for bankruptcy. On January 23, 2007, OCA sued defendants in bankruptcy court seeking relief for breach of contract, promissory estoppel, conversion, unjust enrichment, quantum meruit, account stated, and fraudulent conveyance. (R. Doc. 1-1). Defendants counterclaimed, seeking declaratory relief that the contract was invalid and/or damages for breach of contract and breach of fiduciary duty. (R. Doc. 1-2). On November 5, 2007, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 9). Starr now moves for summary judgment on the issue of whether the BSA is invalid and unenforceable under Massachusetts law. (R. Doc. 19).

**II.  Legal Standard**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury

to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

**III. Discussion**

    **A.   The invalidity of the BSA under Massachusetts' professional corporation statute**

Neither party disputes that a dental partnership between

7

Starr and OCA would be illegal under Massachusetts law. In Massachusetts, professional corporations may be organized for the purpose of rendering professional services. Mass Gen. Laws. Ann. ch. 156A, § 3(a). Only licensed persons, partnerships in which all partners are licensed persons, or professional corporations may own shares in a professional corporation. Mass Gen. Laws. Ann. ch. 156A, § 10(a). Accordingly, only licensed dentists may own a share in a dental partnership. It is undisputed that OCA is not a licensed dentist. Therefore, if OCA and Starr are partners, as Starr contends, their business arrangement violates chapter 156A, section 10.

Massachusetts law provides that a partnership is "an association of two or more persons to carry on as co-owners a business for profit." Mass. Gen. Laws Ann. ch. 108A, § 6(a). Profit-sharing is prima facie evidence of partnership, unless the profits were received in payment:

> (a) Of a debt by installments or otherwise,
>
> (b) As wages of an employee or rent to a landlord,
>
> (c) As an annuity to a widow or representative of a deceased partner,
>
> (d) As interest on a loan, though the amount of payment varies with the profits of the business,

> (e) As the consideration for the sale of the good will
> of a business or other property by installments or
> otherwise.

Mass. Gen. Laws Ann. ch. 108A, § 7(4). But profit-sharing does not in and of itself establish a partnership. *See Seeman v. Eneix*, 172 N.E. 243, 245 (Mass. 1930); *Rosenblum v. Springfield Produce Brokerage Co.*, 137 N.E. 357, 361 (Mass. 1922); *Rice v. Austin*, 17 Mass. 197, 205-06 (Mass. 1821) ("It cannot, however, be true, that all who participate in the profits, are to be considered as partners, in respect to the concern or adventure, from which the profits arise."). Courts look to several factors to determine whether a partnership exists: (1) whether there is an agreement by the parties manifesting an intention to associate as a partnership, (2) whether the parties shared profits and losses, and (3) whether the parties participated in the control or management of the enterprise. *Andrews v. Elwell*, 367 F. Supp. 2d 35, 39 (D. Mass. 2005) (citing *Kansallis Finance Ltd. v. Fern*, 40 F.3d 476, 478-79 (1st Cir. 1994)).

Here, OCA's remuneration was 40% of the practice's profits. Thus defendants have established a prima facie case of partnership. The BSA also shows that OCA participated extensively in the control and management of the orthodontic practice. OCA controlled the practice's finances (BSA at ¶¶1.7-

9

1.8) and negotiated contracts on its behalf. (BSA at ¶1.10). OCA had numerous other managerial responsibilities under the BSA. OCA was responsible for employing and training office staff, marketing and advertising, and providing legal services for the practice's routine operations. (BSA at ¶1.1). OCA handled all bookkeeping tasks for the practice, as well as all billing and collections. (BSA at ¶¶1.7-1.9). It maintained the insurance for the Center premises and equipment (BSA at ¶6.2) and had the power to negotiate managed care contracts with health maintenance organizations and the like on behalf of the practice. (BSA at ¶1.10). OCA leased the practice's office space and provided the furniture and equipment for the office. (BSA at ¶¶1.4-1.5). OCA required Starr to devote at least a certain number of hours per month to the practice, equal to the average number of hours per month that he devoted to the practice during the year before the agreement. (BSA at ¶2.5). OCA also restricted the orthodontist's ability to practice outside of the agreement for the BSA's 25-year term and two years after the BSA ended. (BSA at ¶5.2). This non-competition provision demonstrates that OCA wanted to protect its economic interest in the joint enterprise, because a competing dental practice could endanger OCA's profits.

Further, OCA and the orthodontist had to agree to develop new offices, and the costs of these ventures were to be borne 60%

by the orthodontist and 40% by OCA. (BSA at ¶3.3). OCA's interest in the practice also continued if Dr. Starr died or became permanently disabled. (BSA at ¶4.5). Under such circumstances, OCA was to use its best efforts to recruit a new orthodontist to take over the practice. If OCA could not find a successor orthodontist, Starr's practice agreed to transfer its rights, ownership, and interest in the practice to OCA and/or any reasonably qualified dentist or orthodontist designated by OCA for nominal consideration. (BSA at ¶4.5(b)). Thus upon Starr's death, if a successor orthodontist was not found, OCA effectively gained title to the practice.

In reviewing a similar agreement the Fifth Circuit characterized it as follows:

> [T]he BSAs create an interlocking set of obligations that required OCA to exercise considerable control over the Orthodontists' practices. For instance, OCA conducted the financial and marketing activity of the practices, and it maintained the facilities, equipment, and support personnel required to operate the practices. The BSAs also stipulated how much each Orthodontist was required to work, and greatly restricted their ability to perform services outside of the BSAs. In exchange for these services, OCA charged a fee that was tied to the profits of the practices. The BSAs provide little to no ability for the Orthodontists to oversee any of OCA's decisions related to the practice. Ultimately, the Orthodontists were essentially only left with control over diagnosing and treating their patients.

*In re OCA, Inc.*, --- F.3d ---, 2008 WL 5192077 at *7 (5th Cir.

2008). The Fifth Circuit had little difficulty concluding that the BSA violated a Texas statute prohibiting unlicensed persons from owning, operating, or maintaining a dental practice. *Id.* Similarly here, OCA effectively operated and controlled the business aspects of the practice. This control is evidence of a partnership. *See Andrews*, 367 F. Supp. 2d at 39.

OCA seeks to rebut the indicia of partnership by pointing to the BSA's disclaimer. The relevant provision provides:

> In performing its duties hereunder, OCS shall act and perform as an independent contractor of the PC and the provisions hereof are not intended to create any such partnership, joint venture, agency or employment relationship between such parties.

(BSA at § 5.7). The Court recognizes that the intention of the parties is an important factor in determining whether a partnership exists. *See Quigley v. Zieff*, 1994 WL 879937 at *9 (Mass. Super. Ct. 1994) (citing *Seeman v. Eneix*, 272 Mass. 189, 194 (1930)). But "[t]he only necessary intention . . . is an intent to do those things which constitute a partnership." *In re Inbar*, 121 B.R. 132, 135 (Bankr. D. Mass. 1990); *see also Quigley*, 1994 WL 879937 at *9. Despite the disclaimer, the BSA provisions evince an intent to "carry on as co-owners a business for profit." Mass. Gen. Laws Ann. ch. 108A, § 6(a). OCA's ability to control and manage the practice for a term of 25 years

and restrict Starr's ability to compete shows that OCA had an investment in the practice beyond that of an independent contractor. The terms of the BSA demonstrate that the agreement, in substance, created a joint enterprise for the operation of an orthodontic practice for mutual profit. The arrangement was a partnership, and such a relationship violates chapter 156A, section 10(a).

**B.    Severability and enforceability**

In Massachusetts, the authority to enforce the lawful portion of an illegal contract depends on whether that portion is severable from the agreement. *T.F. v. B.L.*, 813 N.E.2d 1244, 1251 (Mass. 2004) (citing *Bishop v. Palmer*, 16 N.E. 299 (1888)). A portion of a contract that is severable and enforceable ordinarily confers benefits and obligations on both sides. *Id.* (citing *Carrig v. Gilbert-Varker Corp.*, 50 N.E.2d 59 (Mass. 1943)). Although the BSA contains a severability clause (BSA at ¶8.8), the provision at issue here is the service fee arrangement — the entire consideration for OCA's management services under the contract. Without the service fee, the remaining portion of the contract does not confer benefits and obligations on both sides. Further, OCA has failed to identify any provision of the BSA that could be severed in order to reform the agreement. *See*

*In re OCA,* --- F.3d ---, 2008 WL 5192077 at *7 (finding that a severability clause did not save an OCA contract under Texas law since OCA failed to identify which provision of the BSA could be severed). Accordingly, the BSA cannot be reformed.

Massachusetts courts generally do not enforce illegal contracts. *See Arcidi v. Nat'l Ass'n of Gov't. Employees*, 856 N.E.2d 167, 171 (Mass. 2006) ("It has long been settled that the law will not aid either party to an illegal contract to enforce it against the other."). The court leaves the parties where it finds them. *Id.* Although there is an exception when the parties are not in *pari delicto*, *see id.* at 172, that exception does not apply in this case. Here, OCA brought claims of declaratory relief as to the validity of the contract, breach of contract, promissory estoppel, conversion of the dental equipment OCA owned, unjust enrichment, quantum meruit, account stated, and fraudulent conveyance. (R. Doc. 1-1). All of these claims are premised on the parties' illegal relationship created under the BSA and are thus unenforceable. Similarly, Starr's claims for breach of contract and breach of fiduciary duty are also unenforceable. Accordingly, the Court will leave the parties where it found them.

**IV. Conclusion**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment.

New Orleans, Louisiana, this <u>6th</u> day of February, 2009.

_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

**IV. Conclusion**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment.

New Orleans, Louisiana, this <u>6th</u> day of February, 2009.

_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE